UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

ERIC DEBERRY,

                Plaintiff,

   – against –

THE CITY OF NEW YORK, PATRICIA
TUFO, RONALD BARCUS, and JOHN AND
JANE DOES 1-25,

                Defendants.

Case No. 21-CV-5117

**COMPLAINT**

JURY TRIAL DEMANDED

WHITE & CASE LLP

Samuel P. Hershey
David Hille
Gina Chiappetta
Sally Kagay
1221 Avenue of Americas
New York, New York 10020
(212) 819-8200

DAVID B. SHANIES LAW OFFICE LLC

David B. Shanies
Deborah I. Francois
Morgan A. Miller
411 Lafayette Street, Sixth Floor
New York, New York 10003
(212) 951-1710

Plaintiff Eric DeBerry, by his undersigned *pro bono* counsel White & Case LLP and co-counsel David B. Shanies Law Office LLC, as and for his complaint against the above-named Defendants, alleges as follows:

## **INTRODUCTION**

1.      Mr. DeBerry brings this action under 42. U.S.C. § 1983 and New York State law, seeking to recover damages caused by the denial of his constitutional and legal rights and his resulting wrongful conviction and loss of liberty.

2.      In 2000, Mr. DeBerry was wrongfully convicted of one count each of assault in the first degree, robbery in the first degree, and criminal possession of a weapon in the second degree based solely on the false testimony of a single purported eyewitness, Kareem Collins.  Mr. DeBerry was accused of robbing and shooting Mr. Collins after allegedly recognizing him as a rival gang member, based on Mr. Collins's allegedly wearing a blue jersey.

3.      Mr. DeBerry had no involvement in any robbery or shooting of Mr. Collins.  At the time of the incident, Mr. DeBerry was at home, in his bed.

4.      Following the shooting, New York City Police Department (the "NYPD") Detective Patricia Tufo repeatedly visited Mr. Collins, both in the hospital and after he was discharged, to question him about the incident.  During these visits, Defendant Tufo pressured Mr. Collins, with both threats and favors, to identify Mr. DeBerry as his shooter.  Among other things, she told Mr. Collins that if he helped her, she would help him; showed Mr. Collins a photo array containing Mr. DeBerry's photograph, pointed to Mr. DeBerry's photograph, and pressured Mr. Collins to identify Mr. DeBerry as the perpetrator; informed Mr. Collins that she knew he was in possession of an illegal gun and that she had other information that could be harmful to him; and conferred an additional benefit on Mr. Collins by personally escorting him to Kings County Criminal Court and ensuring that his active arrest warrants were vacated.  In short, Defendant Tufo

communicated to Mr. Collins, through her words, actions, or demeanor that he would suffer negative consequences if he did not cooperate with her (and benefits if he did), and Mr. Collins understood that she was threatening him with arrest and prosecution.

5.    Under such pressure from Defendant Tufo, Mr. Collins agreed to identify, and did identify, Mr. DeBerry as the man who robbed and shot him.

6.    Mr. Collins was the only witness—and his testimony the only evidence—that the prosecutors presented against Mr. DeBerry at trial.  The People offered no other witness's testimony, no physical or forensic evidence, and no evidence in support of the alleged gang-related motive.  On the meager basis of Mr. Collins's testimony, on March 28, 2000, Mr. DeBerry was wrongfully convicted and sentenced to 25 years to life.

7.    Then, in 2002, Roberto Velasquez admitted in a sworn confession that he, not Mr. DeBerry, had shot Mr. Collins.  Based on Mr. Velasquez's confession, Mr. DeBerry filed a motion to vacate his conviction under Section 440.30(1)(a) of the New York Criminal Procedure Law (the "2003 440 Motion").  In connection with that motion, Mr. Velasquez testified at a hearing (the "First 440 Hearing") that he, not Mr. DeBerry, shot Mr. Collins.

8.    However, because Mr. Velasquez's account differed so sharply from Mr. Collins's trial testimony, the Supreme Court of the State of New York, County of Kings (the "Trial Court") rejected his confession as implausible, and Mr. DeBerry's 2003 440 Motion was denied.  Mr. DeBerry remained incarcerated.

9.    Any doubt about Mr. Velasquez's confession was dispelled in 2018, when Mr. Collins issued his own sworn recantation of his trial testimony, admitting that he did not recognize the man who shot him and identified Mr. DeBerry solely due to Defendant Tufo's improper

pressure.  In 2019, based on Mr. Collins's affidavit, Mr. DeBerry filed a second motion to vacate his conviction under Section 440.30(1)(a) (the "2019 440 Motion").

10.    At a hearing before the Trial Court, Mr. Collins testified that he falsely identified Mr. DeBerry as his shooter and confirmed the pertinent details of Mr. Velasquez's 2003 testimony, explaining that his false trial testimony was the product of police coercion.

11.    Thus, since Mr. DeBerry's conviction, the only two men actually involved in the crimes for which Mr. DeBerry was convicted—Mr. Collins, the victim of the crimes, and Mr. Velasquez, the perpetrator of the crimes—both testified under oath, against their own interests, that Mr. DeBerry did not commit any of the offenses for which he was charged and convicted.

12.    On June 16, 2020, the Trial Court—which had presided over the trial, the First 440 Hearing, and the Second 440 Hearing, and thus had heard all the evidence and testimony throughout the entire case—granted Mr. DeBerry's 2019 440 Motion.  The Trial Court found, among other things, that Mr. DeBerry had proven his actual innocence by clear and convincing evidence.

13.    The Trial Court later entered an order clarifying its earlier decision, specifying that it granted Mr. DeBerry's motion under Section 440.10(1)(g) of the Criminal Procedure Law, and dismissing Indictment No. 6281/99.  The Kings County District Attorney's Office (the "KCDA") did not appeal from the Trial Court's decisions.

14.    Mr. DeBerry was released from prison on June 23, 2020.  By that time, he had spent more than 20 years in maximum security prisons, all the while maintaining his innocence.

15.    The following factors, among others, caused Mr. DeBerry's false conviction: the misconduct of Defendants Tufo and Ronald Barcus (together, "Individual Defendants") and the KCDA prosecutors; the unlawful failure by the NYPD and KCDA to supervise these individuals

or intervene to prevent their unlawful conduct; and the misconduct, policies, customs, and practices of the NYPD and KCDA that persistently led to violations of the constitutional rights of criminal suspects and defendants, including Mr. DeBerry. Mr. DeBerry seeks redress for the police and prosecutorial misconduct that caused him to spend more than 20 years in prison, and the mental and physical injuries he sustained in prison, as a result of his false and unlawfully procured conviction.

## **NATURE OF THE ACTION**

16.     This is an action to recover compensatory and punitive damages and an award of costs and attorneys' fees for violations of Mr. DeBerry's rights secured by 42 U.S.C. §§ 1983 and 1988 and by the U.S. Constitution, including its Fourth, Fifth, and Fourteenth Amendments, because of Defendants' fabrication of evidence to arrest and prosecute Mr. DeBerry for crimes he did not commit. Specifically, Defendant Tufo coerced Mr. Collins into giving a false statement and identification of Mr. DeBerry, and Defendant Barcus knew or was deliberately indifferent to this fact. That coerced and false identification served as the sole grounds for Mr. DeBerry's arrest, indictment, prosecution, conviction, and more than 20 years of wrongful incarceration.

17.     The lawsuit also seeks to hold Defendant the City of New York liable for the police and prosecutors' misconduct under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). The NYPD and KCDA maintained unlawful policies, practices, and customs during Mr. DeBerry's investigation, arrest, and trial. In executing these unlawful policies, practices, and customs, police and prosecutors violated the constitutional rights of criminal suspects and defendants, including Mr. DeBerry. In Mr. DeBerry's case, the unlawful policies, practices, and customs enabled Individual Defendants, as well as other members, servants, employees, and agents of the NYPD and KCDA, to violate Mr. DeBerry's constitutional rights. The policy-making officials acting on

behalf of the City of New York were deliberately indifferent to these unlawful policies, practices, and customs. As a result, the City of New York is liable for Mr. DeBerry's injuries.

## JURISDICTION AND VENUE

18. This action is brought under 42 U.S.C. §§ 1983 and 1988 in that Mr. DeBerry alleges that he was deprived under color of law of his rights under the Fourth, Fifth, and Fourteenth Amendments to the U.S. Constitution because of the coercion of a false identification against him; the fabrication of evidence, specifically, the false statements of Mr. Collins before the grand jury and at trial; Mr. DeBerry's arrest and prosecution in the absence of probable cause; and the suppression of *Brady* information.

19. This Court has original subject matter jurisdiction over Mr. DeBerry's federal law claims under 28 U.S.C. §§ 1331 and 1343, this being an action seeking redress for the violation of Mr. DeBerry's constitutional and civil rights.

20. Venue is proper in the United States District Court for the Eastern District of New York under 28 U.S.C. § 1391 because Mr. DeBerry's claims arose in this District.

## CONDITIONS PRECEDENT

21. Mr. DeBerry has complied with all conditions precedent to the commencement of this action, having timely served on September 2, 2020 a notice of claim upon the Comptroller of the City of New York, under Section 50-i of the New York General Municipal Law; having waited more than 30 days since said service, without these claims having been settled or otherwise resolved; having had a hearing under Section 50-h of the New York General Municipal Law on February 3, 2021; and having brought this action in a timely manner.

## PARTIES

22.     Plaintiff Eric DeBerry is a citizen of the United States and was, at all times relevant to this action, a resident of the County of Kings, in the City and State of New York.  He was born in Brooklyn, New York and currently resides in New Jersey.

23.     Defendant the City of New York is and was at all relevant times a municipal corporation existing under and by virtue of the laws of the City and the State of New York, and having the powers and duties imposed by law thereon.

24.     The NYPD and KCDA are and were at all relevant times agencies of Defendant the City of New York.  At all times relevant to this action, Defendant the City of New York, by its agents, servants, and employees was responsible for the operation, maintenance, and control of the NYPD and KCDA, and the selection, training, supervision, and disciplining of police officers and prosecutors.

25.     At all relevant times, the Kings County District Attorney (the "District Attorney" or "DA"), including Charles Hynes, was and is an elected officer of Kings County responsible for the KCDA, an agency funded by Defendant the City of New York.

26.     The KCDA and its authorized delegates at all relevant times had final authority, and constituted policymakers for the City of New York and for whom the City of New York is liable, with respect to the hiring, management, training, supervision, and discipline of personnel employed by or assigned to the KCDA.

27.     The District Attorney was and is designated a "local officer," rather than a "state officer," under Section 2 of the New York Public Officers Law.

28.     The State of New York has provided by statute that Defendant the City of New York's constituent counties—including Kings County—and hence Defendant the City of New York itself, is liable for torts committed by County officers and employees, such as the District

Attorney and Kings County Assistant District Attorneys (the "ADAs"), and other employees of the KCDA. *See* N.Y. County Law § 53,941.

29.     Defendant the City of New York was at all times relevant the public employer of Individual Defendants and John and Jane Does 1 through 25, and legally responsible for torts they commit within the scope of their employment or under color of law. Defendant the City of New York is also obligated under law and by contract to indemnify and defend the individual defendants named herein.

30.     Defendant Patricia Tufo is a retired officer of the NYPD. At all relevant times, she was a duly appointed and acting officer of the NYPD employed by Defendant the City of New York. Based on information and belief, she held this employment from January 1983 through January 2008 and the rank of Detective, First-Grade during all or part of this period. At all relevant times, Defendant Tufo acted toward Mr. DeBerry under color of law, and in her individual capacity within the scope of her employment under the statutes, ordinances, regulations, policies, customs, and usages of the State of New York and City of New York. This lawsuit seeks to hold Defendant Tufo liable in her individual capacity.

31.     Defendant Ronald Barcus is a current or former officer of the NYPD. At all relevant times, he was a duly appointed and acting officer of the NYPD employed by Defendant the City of New York. Based on information and belief, he has held this employment from July 1986 through the present and the title of Police Officer during all or part of this period. At all relevant times, Defendant Barcus acted toward Mr. DeBerry under color of law, and in his individual capacity within the scope of his employment under the statutes, ordinances, regulations, policies, customs, and usages of the State of New York and City of New York. This lawsuit seeks to hold Defendant Barcus liable in his individual capacity.

32.     Defendants John and Jane Does 1 through 25 are officers and/or supervisors in the NYPD acting toward Mr. DeBerry under color of law and in their individual capacities within the scope of their employment under the statutes, ordinances, regulations, policies, customs, and usages of the State of New York and City of New York, who participated in the misconduct alleged herein but whose actual names Mr. DeBerry has been unable to ascertain notwithstanding reasonable efforts to do so.  This lawsuit seeks to hold Defendants John and Jane Does 1 through 25 liable in their individual capacities.

## JURY DEMAND

33.     Mr. DeBerry hereby demands trial by jury of all issues raised in this complaint.

## FACTS

### A.     The Crimes and Investigation

34.     In the early hours of July 11, 1999, police found Mr. Collins on a bench near the apartment complex in Brooklyn known as "Smurf Village," bleeding from several gunshot wounds.

35.     Mr. Collins told the police that he was standing outside a nearby grocery store when a man approached him.  Mr. Collins reported that the man said nothing to him, he felt as if he were about to be robbed, he saw a gun in the man's hands, he attempted to flee, and he was shot as he was running away.

36.     First responders rushed Mr. Collins to the hospital, where he underwent emergency surgery to treat, among other things, a collapsed lung and severe internal bleeding.

37.     After the shooting, Defendant Tufo arrived at the crime scene.

38.     Defendant Tufo later claimed that an anonymous woman told Defendant Tufo that her unnamed friend said a man named "Eric," who went by the nickname "E," was the perpetrator.  Based on this anonymous, hearsay report, Defendant Tufo focused on Mr. DeBerry as her suspect.

39.     Police records claimed that the anonymous woman's daughter, who did not hear or see the shooting, later stated that someone named "Eric" lived at 750 Herkimer Street, was approximately 5'7" in height, and wore his hair in braids.

40.     Based on those conversations, Defendant Tufo identified Mr. DeBerry as a suspect, even though his 5'11" frame did not match the description she received.

41.     Defendant Tufo assembled a photo array of color photographs, including Mr. DeBerry's.  *See* Ex. A (Photo Array).

42.     Several witnesses—including the unnamed person who claimed to have witnessed the incident—reported that two guns were fired on July 11, 1999 and that the shots were fired in what was a shootout, not a shooting.

43.     Another witness said that she heard about 12 shots fired—triple the number of gunshot wounds Mr. Collins had suffered.

44.     Before speaking with Mr. Collins, Defendant Tufo ran a search of Mr. Collins's criminal record and found that he had an outstanding bench warrant.  She recorded that search in a "DD-5" report.

45.     On July 12, 1999, the day after the shooting, Defendant Tufo visited Mr. Collins at the hospital and asked him to identify his shooter.  He did not identify anyone at that time.

46.     Mr. Collins allegedly told Defendant Tufo that on the night of the shooting, while he was walking through Smurf Village, two men asked him if he was a member of the Crips gang and shot him as he tried to walk away.

47.     When Defendant Tufo confronted Mr. Collins with the different account he had given to the responding officers—that he had been a victim of a robbery—Mr. Collins told her that he made that account up.

48.     On July 23, 1999, Defendant Tufo first took Mr. Collins to Smurf Village, the scene of the shooting, and then to the 81st Precinct, where she showed him the photo array she had prepared.

49.     Mr. Collins told Defendant Tufo that he did not recognize his shooter among the photographs.

50.     Defendant Tufo told Mr. Collins that she knew he had been in possession of an illegal gun.  Defendant Tufo repeatedly told and/or implied to Mr. Collins that she would cause him to be arrested and imprisoned on felony charges if he did not acquiesce to her demand that Collins identify Mr. DeBerry as his shooter.

51.     Defendant Tufo insisted that Mr. Collins make an identification and told him that if he helped her, she would help him.

52.     Defendant Tufo pointed to Mr. DeBerry's photograph and told Mr. Collins that Mr. DeBerry was the shooter.

53.     Later the same day, Defendant Tufo escorted Mr. Collins to court and successfully arranged for his open bench warrants to be vacated.  *See* Ex. B (Collins Court Records).

54.     After Defendant Tufo's numerous threats and favors, Mr. Collins agreed to falsely identify Mr. DeBerry as the man who shot him.

55.     On August 4, 1999, Defendant Tufo took Mr. Collins to the 81st Precinct, where he falsely identified Mr. DeBerry in a line-up.

56.     On the same day, Defendant Tufo closed the investigation, less than one month after it began.

57.     On August 14, 1999, an anonymous caller reported to police that a man named "Robert Velasquez" had shot Mr. Collins.  The anonymous caller also reported that Mr. Velasquez had been boasting about the shooting.

58.     Defendant Tufo accessed Mr. Velasquez's "mugshot pedigree," which indicated that Mr. Velasquez is 5'6" and wore his hair in braids, consistent with the description of the shooter she had previously received.

59.     Defendant Tufo did not interview Mr. Velasquez or take any other meaningful steps to investigate Mr. Velasquez as the shooter.

**B.      The Trial, Suppression of Critical Evidence, and Conviction**

60.     On January 10, 2000, Mr. Collins testified at Mr. DeBerry's trial.  Mr. Collins falsely identified Mr. DeBerry as his shooter, and falsely claimed that Mr. DeBerry shot him because he (Collins) was wearing a blue jersey, which allegedly marked him as a member of a rival gang.

61.     The gang theory that the prosecution presented and allowed Mr. Collins to testify to at trial was entirely unsupported by record evidence.

62.     Although Mr. Collins testified, and the People argued, that Mr. Collins was wearing a blue jersey on the night he was shot, no blue jersey was ever recovered or presented into evidence, even though Mr. Collins was found at the scene.

63.     In fact, the evidence showed that when he was shot, Mr. Collins was not wearing a blue jersey, but rather a black and red jersey.  *See* Ex. C (Collins Jersey Photo).

64.     Three separate detectives who saw the shirt that Mr. Collins was wearing when he was shot—two of whom testified at trial—identified it not as blue, but as black and red.  On the day of Mr. Collins's shooting, Defendant Barcus documented Mr. Collins's "Blk & RED Shirt" being vouchered into evidence.  That same day, Detective Thomas Signorelli requested a

laboratory examination of Mr. Collins's "Black & Red Shirt."  Then, Defendant Tufo—who, as lead detective, was responsible for reviewing the evidence collected—recorded that "a blk/red shirt" was recovered from the scene.  The detectives' consistent representations of Mr. Collins's shirt as "black and red" comports with the plain appearance of the shirt.

65.　　Defendant Tufo knowingly coerced Collins's false testimony about a blue shirt through threats of arrest and imprisonment and promises of leniency for his cooperation.

66.　　Defendant Barcus knew of and aided, and/or failed to intervene to prevent, Detective Tufo's coercion of Collins's false testimony about a blue shirt.

67.　　Mr. Collins's false testimony was the only evidence linking Mr. DeBerry to the shooting.

68.　　There was no physical, forensic, or testimonial evidence to support or corroborate Mr. Collins's testimony that Mr. DeBerry had shot him.

69.　　Defendant Barcus was called to testify at trial, and he agreed that the only evidence linking Mr. DeBerry to the alleged crime was Mr. Collins's identification.

70.　　Additionally, at trial, the prosecution suppressed critical evidence regarding Mr. Collins's credibility.

71.　　Specifically, the prosecution withheld from both the defense and the jury that Defendant Tufo had learned of Mr. Collins's outstanding bench warrant prior to first interviewing him, and subsequently aided to have the warrant vacated on the same day that Mr. Collins identified Mr. DeBerry in a photo array.

72.　　Additionally, the jury was not informed that Defendant Tufo had threatened Mr. Collins with a gun possession charge (or worse) if he did not identify Mr. DeBerry.

73. The prosecution was obligated to disclose that Mr. Collins had been threatened with a gun possession charge by the investigating detective, as that fact could have been used on cross-examination to explore whether he received some benefit from the government in exchange for his testimony, such as avoiding such a charge.

74. The prosecution was similarly required to disclose that Mr. Collins had an outstanding bench warrant, as that fact also could have been used on cross-examination to assess whether he received from the government some other benefit, such as avoiding arrest on that bench warrant.

75. The prosecution had an unequivocal duty to disclose that Mr. Collins did, in fact, receive such a benefit from his bench warrant being waived, and that Defendant Tufo played a key role in providing that benefit.

76. Indeed, a "DD-5" report completed by Defendant Tufo herself demonstrates that she did not arrest Mr. Collins upon learning that there was a bench warrant outstanding against him, as she was required to do. Instead, she personally escorted him to Kings County Criminal Court with the express purpose of clearing the bench warrant and did, in fact, have the bench warrant vacated and the remainder of the terms of his plea agreement waived.

77. Given that Mr. Collins's testimony was the only evidence supporting Mr. DeBerry's conviction and that Defendant Tufo's role in clearing Mr. Collins's bench warrant is material to Mr. Collins's credibility, there is a reasonable probability that knowledge of this evidence would have altered the jury's verdict in Mr. DeBerry's favor.

78. The prosecution's suppression of this critical evidence deprived Mr. DeBerry of a full and fair opportunity to cross-examine the only witness connecting him to the crimes for which he was convicted.

79.     Mr. DeBerry was unaware at trial of Mr. Collins's outstanding bench warrant or of Defendant Tufo's role in having it waived.  Meanwhile, proof of the warrant and of Defendant Tufo's role in its waiver was in the prosecution's possession all along.

80.     On the sole basis of Mr. Collins's testimony, Mr. DeBerry was convicted.  He was sentenced to 25 years to life.  At Mr. DeBerry's sentencing, his attorney presented a recording that captured Mr. Velasquez confessing to shooting Mr. Collins.  The Trial Court deemed the recording insufficient to re-open the case.

81.     On March 28, 2000, Mr. DeBerry began serving his sentence.

**C.     Mr. Velasquez's Confession**

82.     In December 2002, Mr. Velasquez issued a sworn confession that he, not Mr. DeBerry, had shot Mr. Collins.  Soon thereafter, Mr. DeBerry filed his 2003 440 Motion, seeking to vacate his conviction.  The Trial Court ordered an evidentiary hearing on the motion, and Mr. Velasquez gave live testimony substantially identical to that provided in his sworn confession.  *See* Ex. D (2003 Hearing Transcript).

83.     Mr. Velasquez testified that:

   a.   On July 11, 1999, around 3:30 a.m., he left his home to pick up chicken from a restaurant on Fulton Street.

   b.   He had won money earlier that day playing dice and carried his winnings in a large wad.

   c.   At the restaurant, he noticed Mr. Collins staring at him as he paid.  When Mr. Velasquez left the restaurant to head home, he realized that Mr. Collins was following him.

   d.   Mr. Velasquez suspected that Mr. Collins intended to rob him.  He therefore veered into an apartment building in Smurf Village and walked up to the third floor.  He waited several minutes and then went downstairs.

   e.   When Mr. Velasquez arrived at the ground floor, Mr. Collins appeared from behind the staircase.

f.   Mr. Velasquez and Mr. Collins exchanged words, and Mr. Velasquez told Mr. Collins to leave.

g.   As Mr. Collins started to walk out, he drew a gun, pointed it at Mr. Velasquez, and told Mr. Velasquez to hand over his money.

h.   Mr. Velasquez pulled out his own gun and shot Mr. Collins.

i.   Mr. Collins shot at Mr. Velasquez and tried to flee.

j.   The men continued to shoot several rounds at each other until Mr. Velasquez retreated, matching the witnesses' description of a shootout.

84.   On June 22, 2004, the Trial Court rejected Mr. Velasquez's testimony and denied Mr. DeBerry's motion.  In particular, the Trial Court noted that Mr. DeBerry's conviction "was based principally upon the eyewitness testimony of Kareem Collins."  The Court reasoned that in order for Mr. Velasquez to be believed, "Collins could not have been merely mistaken as to the identity of the perpetrator, but would have to [have been] lying about the whole occurrence." *See* Ex. E (Decision dated June 22, 2004).

**D.   Mr. Collins's Recantation**

85.   As the Trial Court alluded to, Mr. Collins had been lying about the whole occurrence.

86.   In 2018, 14 years after the First 440 Hearing, Mr. Collins came forward with a sworn recantation of his trial testimony, in which he confessed that he had lied when he identified Mr. DeBerry as the person who shot him.

87.   Mr. DeBerry learned for the first time, through Mr. Collins's affidavit, of Mr. Collins' outstanding bench warrant at the time of the incident.

88.   Mr. DeBerry filed his 2019 440 Motion based on Mr. Collins's affidavit.

89.     Like Mr. Velasquez, Mr. Collins agreed to testify at a hearing regarding his recantation.  Like Mr. Velasquez, Mr. Collins's hearing testimony matched his written recantation.  *See* Ex. F (2019 and 2020 Hearing Transcript).

90.     In December 2019, Mr. Collins testified that:

    a.  On the date of the shooting, he saw a man in a chicken restaurant on Fulton Street.

    b.  Mr. Collins noticed that the man had a wad of cash, and Mr. Collins decided to rob him.

    c.  Mr. Collins followed the man out of the chicken restaurant.

    d.  Soon, the man headed to Smurf Village and entered a building.  Mr. Collins followed him in.

    e.  The man came downstairs with a gun.

    f.  As Mr. Collins left the building, the man shot at him.  He and the man exchanged gunfire.

    g.  Mr. Collins soon realized he was hit.  Mr. Collins retreated and, after being found on a bench, was rushed to the hospital.

91.     Mr. Collins also testified that he did not know the person who shot him, and that he later identified Mr. DeBerry only because Defendant Tufo threatened him and pressured him to identify Mr. DeBerry.

92.     Mr. Collins further testified that Defendant Tufo identified Mr. DeBerry in the photo array as the perpetrator by pointing to his photo.

93.     Mr. Collins further testified that Defendant Tufo threatened him with a gun charge.

94.     Mr. Collins further testified that Defendant Tufo promised to help him in return for his helping her and drove him to court to arrange for his open warrants to be vacated.

95.     Mr. Collins further testified that he falsely identified Mr. DeBerry as the shooter because he feared Defendant Tufo and what she might do to him.

96. In January 2020, following Mr. Collins's hearing testimony, the People provided Mr. DeBerry's counsel copies of two "DD-5" reports, showing that (i) Defendant Tufo learned that Mr. Collins had an outstanding bench warrant on July 11, 1999, the day before she spoke with him for the first time, and (ii) Defendant Tufo took Mr. Collins to court to satisfy the bench warrant on the same day that Mr. Collins first identified Mr. DeBerry. This was the first time Mr. DeBerry learned of or received these documents.

### E. The Trial Court's Decision

97. On June 16, 2020, having heard testimony from both the shooter and the victim confirming that Mr. DeBerry was in no way involved in the shooting for which he was convicted, as well as testimony from Defendant Tufo, the Trial Court vacated Mr. DeBerry's conviction. The Trial Court found "by clear and convincing evidence that Collins lied at trial when he identified DeBerry as his shooter." The Trial Court added that "it is the finding of this court that Defendant Eric DeBerry has established his innocence by clear and convincing evidence. Defendant's motion is granted and the conviction is vacated." *See* Ex. G (Decision dated June 16, 2020).

98. At Mr. DeBerry's request, the Trial Court later issued an order clarifying that its decision to vacate Mr. DeBerry's conviction was made under Section 440.10(1)(g) of the Criminal Procedure Law. *See* Ex. H (Order dated July 27, 2020).

99. The Trial Court vacated the conviction, dismissed the indictment, and closed and sealed the case.

### F. The City of New York's Deliberate Indifference to Improper and Dishonest Police Conduct; *Brady* Violations; Prosecutorial Misconduct; and Failure to Train, Supervise, and Discipline Its Employees

100. Defendant the City of New York acts through policymaking officials for both the NYPD and the KCDA. At the time of Mr. DeBerry's arrest, policymaking officials for both the NYPD and the KCDA engaged in the following misconduct, which was reflected, and led to the

wrongful conviction, in Mr. DeBerry's case: acted with deliberate indifference to the constitutional rights of individuals suspected of or charged with criminal activity; implemented or tolerated plainly inadequate policies, procedures, regulations, practices, customs, training, supervision, and discipline concerning the constitutional duties of officers not to fabricate evidence and to accurately report the nature of their investigations to prosecutors, for police and prosecutors to properly document and disclose *Brady* information, and for prosecutors not to commit misconduct such as by ignoring the falsification of evidence.

### *1. Investigative Reports*

101.    Mr. DeBerry's case was not a random miscarriage of justice in an otherwise functioning law enforcement regime. Reports from several independent bodies demonstrate that Defendant the City of New York, during the relevant time period, was plagued by institutional deficiencies that allowed a wanton and reckless culture to develop within the NYPD and KCDA. This culture allowed employees of the NYPD and KCDA to violate constitutional rights of the citizens of the City of New York without disciplinary risk or repercussions.

102.    On July 7, 1994—just five years before Mr. DeBerry's arrest—the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department issued a report (widely referred to as the "Mollen Report") that addressed corruption in the NYPD. The Mollen Report investigated the 1980s and 1990s through the date of the report's publishing. Importantly, the Mollen Report described the state of corruption in the present tense and stated that the Commission's "findings raise significant concerns about . . . the potential for these problems to grow without sustained vigilance and oversight." Ex. I (Mollen Report) at 1.

103.    The Mollen Report further noted that "[p]olice perjury and falsification of official records is a serious problem facing the Department" that "taints arrests on the streets." *Id.* at 36. The Mollen Report described police falsifications as "probably the most common form of police

corruption facing the criminal justice system" and observed "a deep-rooted perception among many officers of all ranks within the Department that nothing is really wrong with compromising facts to fight crime in the real world. Simply put, despite the devastating consequences of police falsifications, there is a persistent belief among many officers that it is necessary and unjustified, even if unlawful." *Id*. at 41.

104. Importantly, this culture did not persist at the lower levels of law enforcement despite policymaker's best efforts. Rather, the Commission noted that it was "not aware of a single instance in which a supervisor or commander has been sanctioned for permitting perjury or falsification on their watch," *id.*, and found that "[t]here is no evidence that anyone in the Department's chain of command has focused on eliminating this practice, including past Police Commissioners and Internal Affairs Chiefs, who apparently turned a blind eye to unlawful practices that were purportedly committed to fight crime and increase arrest statistics," *id.* at 41-42. Given this situation, the Mollen Report determined that "successful enforcement of command accountability requires a complete reinvention of the systems for enforcing it."

105. The Mollen Report concluded that "[o]fficers and their immediate supervisors are not the only culprits in tolerating falsifications . . . . [T]he Department's top commanders must share the blame." *Id*.

106. This Court has already found that the Mollen Report "provides powerful evidence that there was a custom and practice within the police department of tolerating corruption to avoid bad publicity" and "characterizes this custom as persistent, widespread, and emanating 'from top commanders, including the commissioner.'" *Pipitone v. City of New York*, 57 F. Supp. 3d 173, 191 (E.D.N.Y. 2014). Accordingly, this Court has found that "[t]he Mollen Report thus provides

evidence that is sufficient to allow a jury to conclude that the supervisory and disciplinary failures described therein constituted a municipal policy for *Monell* purposes[.]" *Id.* at 191.

107.    The lack of discipline documented in the Mollen Report continues to this day, as demonstrated by a report released by The Independent Panel on the Disciplinary System of the New York City Police Department, chaired by the Honorable Mary Jo White, the Honorable Robert L. Capers, and former United States District Court Judge for the Southern District of New York Barbara S. Jones. The Panel's report, released in January 2019, made specific note of the endemic culture of false testimony in the NYPD, which was repeatedly "brought to the Panel's attention."[1]

108.    The Panel noted that while "the Patrol Guide expressly forbids officers from lying in connection with their duties, numerous stakeholders have expressed concerns about lax enforcement and practices that enable bad actors to escape accountability and avoid the presumptive termination penalty." The Panel "share[d] the concern that the Department does not do so and treats false statement cases too leniently," particularly as several stakeholders "told the Panel that the Department does not charge officers with making false statements at all when the facts would support such a charge," and another "stakeholder told the Panel that certain historic practices may contribute to a culture in which false statements are condoned."

109.    Furthermore, in 2009, the New York State Bar Association's Task Force on Wrongful Convictions released an investigative report covering 53 cases.[2] It found that "government practices" contributed to more than 50% of New York wrongful convictions,

---

[1]        The report is available at https://www.independentpanelreportnypd.net.

[2]        The cases spanned from 1964 to 2004, a forty-year period that includes Mr. DeBerry's arrest in 1999 and conviction in 2000. Most of the cases were from New York City. Many were from Brooklyn. *Final Report of the New York State Bar Association's Task Force on Wrongful Convictions*, April 4, 2009, ("NYSBA Report") Appendix B, at 186.

including prosecutors' violating *Brady* obligations and "the early prosecutorial focus, especially by the police, on a particular individual as the person who committed the crime coupled with a refusal to investigate to determine if there is a basis to believe, based on available information, that someone else may have committed the crime." NYSBA Report at 19. Both these practices contributed to Mr. DeBerry's wrongful conviction, where (i) the prosecution withheld from the defense evidence of benefits that the prosecution's key witness received from the government in connection with his testimony, and (ii) Defendant Tufo's immediate identification of Mr. DeBerry as a suspect was the result of an anonymous, hearsay report.

110. The Task Force recommended "Train[ing] and Supervis[ing] in the Application of *Brady* and Truthful Evidence Rules" for police. *Id*. at 37. For prosecutors, the Task Force noted that "despite the clarity and longevity of the *Brady* rule, a sampling of recent published or otherwise available decisions show such conduct still occurs." *Id.* at 26 (citations omitted). The Task Force therefore suggested that, to the extent not already in existence, prosecutor's offices should create procedures to evaluate and impose sanctions for prosecutorial misconduct. *Id.* at 29. In the time leading up to Mr. DeBerry's arrest, indictment, trial, and post-conviction litigation, the KCDA did not put such procedures into effect.

111. The post-conviction litigation of *People v. Jabbar Collins* reveals that no such procedure existed around the time of Mr. DeBerry's arrest and conviction. It further reveals that the KCDA was deliberately indifferent to or endorsed *Brady* violations generally. The *Collins* case concerned *Brady* violations in the KCDA in 1994 and 1995—just several years before Mr. DeBerry's trial. Post-conviction discovery revealed that District Attorney Charles Hynes—the same District Attorney in charge of the office when Mr. DeBerry was prosecuted—protected instead of disciplined ADAs when their misconduct was discovered.

112.     Hynes first became District Attorney on January 1, 1990. In the *Collins* case, he and others admitted that the only disciplinary procedure in place for *Brady* violations was for Hynes to personally review the appellate decision to decide if discipline was warranted. Hynes and other KCDA executives could not identify a single instance of a prosecutor being disciplined during Hynes's entire 24-year tenure.

113.     At the time of Mr. DeBerry's prosecution, former DA Hynes, as the manager, chief administrator, and policymaker of the KCDA, a City agency, created and/or maintained policies, customs, and practices of deliberate indifference to violations by his employees of the constitutional rights of individuals who were investigated and criminally prosecuted in Brooklyn, including through (i) manufacturing false and misleading evidence and testimony through improper coercion of witnesses; (ii) knowingly presenting false testimony and arguments at criminal proceedings; (iii) suppressing *Brady* information; (iv) unlawfully arresting, imprisoning, and coercing witnesses; (v) abusing court process; and (vi) covering up these unlawful practices.

114.     These policies, customs, and practices have led the Second Circuit and numerous courts within this District to recognize analogous § 1983 *Monell* claims brought by other wrongfully convicted persons. *See, e.g.*, *Walker v. City of New York*, 974 F.2d 293, 300-01 (2d Cir. 1992) (reversing district court's dismissal of *Monell* claim based on deliberate indifference of KCDA, under former DA Hynes, to prosecutorial misconduct and violations of defendants' constitutional rights); *Bailey v. City of New York*, 79 F. Supp. 3d 424, 441-43 (E.D.N.Y 2015) (denying City's summary judgment motion on *Monell* claim based on deliberate indifference of KCDA, under former DA Hynes, to prosecutorial misconduct and violations of defendants' constitutional rights); *Collins*, 923 F. Supp. 2d at 477 (denying City's motion to dismiss *Monell*

claim based on deliberate indifference of KCDA, under former DA Hynes, to prosecutorial misconduct and violations of defendants' constitutional rights).

115. These policies, customs, and practices persisted from former DA Hynes's induction as District Attorney in 1990 through (and, in certain respects, beyond) the end of his tenure as District Attorney in 2013.

116. Former DA Hynes, as a matter of policy, custom, and practice, permitted, encouraged, and acquiesced in the commission of constitutional violations of the rights of suspects and defendants by prosecutors and investigators working with the KCDA.

117. These policies, customs, and practices proximately caused the violations of Mr. DeBerry's constitutional rights described above and his wrongful conviction, imprisonment, and other damages.

118. Former DA Hynes's policy and practice was to tolerate, fail to discipline, and encourage violations of his Office's constitutional obligations to make timely disclosure to the defense of *Brady* information. Former DA Hynes's deliberate indifference to such violations created an "anything goes" atmosphere that caused such violations to continue, including in Mr. DeBerry's case.

119. Under former DA Hynes's office-wide policies, customs, and practices, prosecutors and investigators were permitted and encouraged to use illegal tactics to coerce witnesses to testify in the manner prosecutors desired, constituting *Brady* and other constitutional violations, including by coercing witnesses who have been arrested on unrelated charges to "cooperate" by exploiting their dependency, holding them prisoner in remote locations while threatening to interrogate them indefinitely, and threatening harsh prosecution and imprisonment while simultaneously holding out the inducements of leniency and monetary reward.

120.     Under former DA Hynes's office-wide policies, customs, and practices, prosecutors and investigators were permitted and encouraged to refrain from making any record of *Brady* information concerning prospective prosecution witnesses to avoid disclosing information favorable to the defense, even though disclosure of such information was and is constitutionally required regardless of whether the information were recorded in written form.

121.     Former DA Hynes's training and discipline policies and practices were likewise consciously designed to permit and encourage *Brady* violations.

122.     Prosecutors and investigators were trained on avoiding the creation of *Brady* and *Rosario* material, instructed not to disclose *Brady* information if they could rationalize non-disclosure by subjectively assessing the information as "unreliable" or "incredible," and encouraged to cover up *Brady* information kept hidden by other members of the KCDA.

123.     Prosecutors were permitted and encouraged not to comply with the KCDA ongoing *Brady* obligations after trial; to resist defendants' efforts to obtain disclosure on appeal, during collateral attacks on convictions, and through FOIL requests; and even to lie or mislead courts in affidavits and testimony, all with the aim of covering up wrongdoing within the KCDA and defeating defendants' efforts to expose misconduct and overturn wrongful convictions.

124.     Prosecutors, in violation of *Brady*, were permitted or encouraged to refrain from disclosing pressure tactics, promises, and rewards used to influence witnesses.

125.     Through a policy, custom, and practice of not disciplining prosecutors or investigators for *Brady* or other constitutional violations and taking no remedial action in cases where such wrongdoing was discovered (through court decisions, post-conviction proceedings, or otherwise), former DA Hynes encouraged such violations by demonstrating to his prosecutors and investigators that there would be no negative consequences for their failure to comply with *Brady*

and other constitutional requirements. To the contrary, prosecutors who violated defendants' due process rights were promoted, praised, given pay raises, and otherwise endorsed by former DA Hynes and his Office.

126. Former DA Hynes had no employee handbook, manual, or other document setting forth any disciplinary process or potential penalties for *Brady* or other constitutional violations by prosecutors or investigators. In fact, there was no such process or penalties.

127. Despite dozens of court decisions finding that prosecutors had wrongfully withheld information, in violation of *Brady*, *Rosario*, or state discovery laws, or otherwise had engaged in conduct that misled courts, juries, defendants, and defense attorneys, none of the prosecutors involved was disciplined.

128. Stunningly, not once during his 24 years in office did former DA Hynes terminate a KCDA prosecutor for prosecutorial misconduct.

### 2. Former District Attorney Hynes Had Ample Notice of the *Prosecutorial and Investigative Misconduct Occurring in His Office*

129. Examples of the decisions that put former DA Hynes on notice of the unlawful conduct being committed by his prosecutors and investigators, before such unlawful conduct led to Mr. DeBerry's false conviction, include:

- *Walker v. City of New York*, 974 F.2d 293 (2d Cir. 1992) – Second Circuit upheld *Monell* claim against City of New York for unlawful policies of the KCDA that allegedly resulted in withholding of *Brady* material causing plaintiff's wrongful conviction and 18-year imprisonment.

- *People v. Vilardi*, 542 N.Y.S.2d 238 (2d Dep't 1989) – Vacating conviction based on prosecutor's failure to turn over exculpatory police report.

- *People v. Lugo*, 544 N.Y.S.2d 985 (2d Dep't 1989) – Granting motion to vacate conviction based on *Brady* and *Rosario* violations, holding that *Rosario* violation clearly undermined conviction, rendering further *Brady* analysis unnecessary.

- *People v. Rayford*, 158 A.D.2d 482 (2d Dep't 1990) – Prosecutor suppressed exculpatory information concerning use of suggestive identification procedures.

- *People v. Nedrick,* 166 A.D.2d 725 (2d Dep't 1990) – Prosecutor failed to disclose tape-recorded impeachment material.

- *People v. Anderson,* 160 A.D.2d 806 (2d Dep't 1990) – Prosecutor failed to timely disclose impeachment material.

- *People v. Brazzeal*, 172 A.D.2d 757 (2d Dep't 1991) – Prosecutor's improper summation violated defendant's due process rights.

- *People v. Faison,* 176 A.D.2d 752 (2d Dep't 1991) – Prosecutor failed to timely disclose witness's prior statement.

- *People v. Crespo,* 188 A.D.2d 483 (2d Dep't 1992) – Mistrial granted due to prosecutor's *Brady* violation.

- *People v. Brown,* 187 A.D.2d 437 (2d Dep't 1992) – Trial court sanctioned prosecutor for *Brady* violation.

- *People v. Cecora,* 186 A.D.2d 215 (2d Dep't 1992) – Prosecution and police failed to disclose interview notes containing potential impeachment information.

- *People v. Hughes,* 181 A.D.2d 132 (2d Dep't 1992) – Hearing required regarding prosecution's failure to disclose exculpatory police report.

- *People v. Inswood,* 180 A.D.2d 649 (2d Dep't 1992) – Prosecution's failure to turn over *Brady* material was error; assigned prosecutor is subsequently promoted, does not receive negative feedback or personnel action.

- *People v. Lebron*, 585 N.Y.S.2d 498 (2d Dep't 1992) – Prosecution's presentation of false testimony that was "completely unbelievable and untrustworthy" required reversal of conviction.

- *People v. Jackson,* 198 A.D.2d 301 (2d Dep't 1993), *affirming* 154 Misc. 2d 718 (Sup. Ct. Kings Cty. 1992) – Prosecutors failed to timely disclose exculpatory statements; conviction reversed.

- *People v. Gurley*, 602 N.Y.S.2d 184 (2d Dep't 1993) – Affirming trial court's grant of post-conviction motion arising from KCDA's suppression of *Brady* information.

- *People v. Stevens,* 199 A.D.2d 441 (2d Dep't 1993) – *Brady* and *Rosario* material improperly withheld; prejudice not sufficient to require reversal.

- *People v. Cortez,* 149 Misc. 2d 886 (Sup. Ct. Kings Cty. 1990) – Prosecutors and police violated *Brady* and court order by intentionally destroying tape containing impeachment material.

- *People v. Young,* 155 Misc. 2d 878 (Sup. Ct. Kings Cty. 1992), *on remand from,* 79 N.Y. 2d 365 (1992) – Failure to disclose impeachment material required new trial; hearing court condemned prosecution for tailoring testimony.

- *People v. Giddings,* 2/21/92 NYLJ 25 (col. l) (Sup. Ct. Kings Cty. Feb. 21, 1992) – Prosecutor's failure to disclose witness's prior inconsistent statements required conviction to be vacated).

### 3. *Examples of the KCDA's Unlawful Policies, Practices, and Customs*

130. Examples of former DA Hynes's ongoing policies and practices, of encouraging,

authorizing, and/or permitting misconduct by his prosecutors and investigators, include:

- *Leka v. Portuondo,* 257 F.3d 89 (2d Cir. 2001) – Conviction overturned on habeas review due to prosecution's suppression of *Brady* material; prosecutor also misled defense counsel regarding a crucial witness.

- *Boyette v. LeFevre,* 246 F.3d 78 (2d Cir. 2001) – Conviction vacated on habeas review because prosecutors suppressed *Brady* material.

- *Waston v. Greene,* 2009 WL 5172874 (E.D.N.Y. Dec. 30, 2009) – Prosecutors disclosed *Brady* material "too late" for the defense to make use of it even though they were aware of material "more than a year in advance of trial."

- *People v. Scott,* 88 N.Y. 2d 888 (N.Y. 1996) – Prosecution failed to disclose statement regarding polygraph result.

- *People v. Bond,* 95 N.Y. 2d 840 (N.Y. 2000) – Myriad *Brady* violations established at Section 440.10 hearing, including failure to disclose material witness proceeding concerning principal witness; conviction reversed due to prosecution's failure to disclose prior unrecorded statements to police by prosecution's main witness that she did not see the shooting about which she testified as an "eyewitness."

- *People v. Calabria,* 94 N.Y.2d 519 (N.Y. 2000) – Prosecutor repeatedly defied court's ruling and made false or misleading argument to jury.

- *People v. Jenkins,* 98 N.Y. 2d 280, 287-88 (N.Y. 2002) (Kaye, C.J., dissenting) – Prosecutor's late disclosure of ballistics report "blind sided" the defense and was inexcusable.

- *People v. Fuentes,* 12 N.Y. 3d 259 (N.Y. 2010) – Prosecutor improperly withheld portion of medical records containing potentially favorable evidence for the defense; two judges find the suppression was "deliberate."

- *People v. Khadaidi,* 201 A.D.2d 585 (2d Dep't 1994) – Conviction reversed for prosecution's failure to disclose interview notes with complainant containing prior inconsistent statement)

- *People v. Alvarado,* 201 A.D.2d 486 (2d Dep't 1994) – Prosecution failed to disclose police reports containing impeachment material; conviction reversed.

- *People v. Barnes,* 200 A.D.2d 751 (2d Dep't 1994) – Prosecutor did not record and did not disclose eyewitness's recantation; conviction not reversed because eyewitness ultimately recanted on the witness stand and was adequately cross-examined.

- *People v. Bramble,* 207 A.D.2d 407 (2d Dep't 1994) – Sanctions upheld for prosecution's failure to preserve police audiotapes notwithstanding defense discovery request.

- *People v. Roberts,* 203 A.D.2d 600 (2d Dep't 1994) – Prosecution delayed one year in disclosing exculpatory witness statement, by which time witness was unavailable; conviction reversed.

- *People v. Neptune,* 161 Misc. 2d 781 (Sup. Ct. Kings Cty. 1994) – Prosecution acted unethically by improperly using invalid subpoena to cause a witness to appear for an interview at the KCDA.

- *People v. Scott,* 216 A.D.2d 592 (2d Dep't 1995) – Prosecutor suppressed reports, including polygraph results indicating key witness was withholding information.

- *People v. Rahman,* 231 A.D.2d 745 (2d Dep't 1996) – Matter remitted for hearing concerning prosecution's apparent improper withholding of witness's cooperation agreement.

- *People v. Perkins,* 227 A.D.2d 572 (2d Dep't 1996) – Prosecutor failed to disclose cooperation agreement with witness.

- *People v. Callendar,* 227 A.D.2d 499 (2d Dep't 1996) – Conviction reversed due to prosecutor's failure to turn over notes of detective's prior statement.

- *People v. Bruce,* 224 A.D.2d 438 (2d Dep't 1996) – Conviction reversed for prosecutor's failure to produce police reports containing impeachment material.

- *People v. Dupont,* Kings County Ind. No. 6287/97 – Prosecutor made misrepresentation by claiming KCDA did not possess physical evidence specifically requested by the defense.

- *People v. LaSalle,* 243 A.D.2d 490 (2d Dep't 1997) – Conviction reversed due to prosecutor's "blatant misrepresentation of the facts" during summation.

- *People v. Gourgue,* 239 A.D.2d 357 (2d Dep't 1997) – Prosecutor put notes of complainant's statements in the form of questions to "circumvent" disclosure obligation; conviction reversed.

- *People v. Hill,* 244 A.D.2d 572 (2d Dep't 1997 – Prosecutor sanctioned for failing to disclose 911 tape.

- *People v. Gramby,* 251 A.D. 3d 346 (2d Dep't 1998) – Prosecutor suppressed and failed to timely disclose 911 tape.

- *People v. Campbell,* 269 A.D.2d 460 (2d Dep't 2000) – Prosecutor's suppression of *Rosario* material, a tape-recorded statement by the complainant, required reversal of conviction.

- *People v. Maddery,* 282 A.D.2d 761 (2d Dep't 2001) – Prosecutor's failure to disclose 911 tape before trial as required by law required reversal of conviction.

- *People v. King,* 298 A.D.2d 530 (2d Dep't 2002) – Prosecutor's failure to disclose 911 tape before trial as required by law required conviction to be reversed.

- *People v. Vielman,* 31 A.D. 3d 674 (2d Dep't 2006) – Reversing conviction because prosecutor's summation rested on a "false premise" and was a "blatant attempt to mislead the jury."

- *People v. Jones,* 31 A.D. 3d 666 (2d Dep't 2006) – Prosecution fails to correct the false testimony of a key witness.

- *People v. Thompson,* 54 A.D. 3d 975 (2d Dep't 2008) – Prosecutor suppressed *Brady* material indicating someone other than the defendant committed the crime.

- *People v. Ramos,* 166 Misc. 2d 515 (Sup. Ct. Kings Cty. 1995) – Due to KCDA policy of not taking notes of witness interviews, trial prosecutor was not aware of information acquired by previously assigned prosecutors for which court had ordered disclosure; conviction vacated on due process grounds.

- *People v. Green,* 10/19/99 N.Y.L.J. p. 30, col. 1 (Sup. Ct. Kings Cty., Oct. 19, 1999) – Prosecution failed to disclose *Brady* material.

- *People v. Davis,* 709 N.Y.S. 2d 345 (Sup. Ct. Kings Cty. 2000) – Prosecution violated court's order to disclose exculpatory evidence to defense before indictment; indictment dismissed.

- *People v. Cannon,* 191 Misc. 2d 136 (Sup. Ct. Kings Cty. 2002) – Prosecution responsible for failure to preserve surveillance photographs.

- *People v. Malik,* 25 Misc. 3d 1214(A) (Sup. Ct. Kings County 2009) – Prosecution's suppression of police report and other documents required vacatur of conviction).

131.    Under former DA Hynes's policies, customs, and practices, no prosecutor was fired, suspended, fined, or demoted for such misconduct.

132.    Even where misconduct was found to have occurred, no record of the misconduct was placed in the personnel file of any prosecutor or investigator responsible.  No prosecutor was ever reported to outside disciplinary bodies for such misconduct, even when the misconduct violated applicable ethical rules.

133.    To the contrary, in opposing defendants' efforts to overturn their convictions in such cases, former DA Hynes stubbornly defended the propriety of his employees' behavior, thereby ratifying and signaling his tolerance of it.  Personnel found to be involved in such misconduct continued to receive raises, bonuses, and promotions—sometimes within weeks or even days of court decisions identifying the misconduct.

134.    High-level KCDA officials have acknowledged in deposition testimony that there was no formal disciplinary procedure or policy for prosecutorial or investigator misconduct committed by KCDA employees, and they were unaware of any prosecutor or investigator ever being disciplined during former DA Hynes's tenure for unconstitutional conduct committed during a criminal investigation or prosecution.  In fact, no discipline had been imposed on any of the prosecutors or investigators involved in cases of proven misconduct.

135.    Former DA Hynes's office likewise had no formal policy requiring disclosure of *Brady* information or any written policy on how to disclose it.

136.    Former DA Hynes's office provided no training on how to question or evaluate informant or accomplice witnesses.

137.    One high-ranking official testified that, despite having virtually daily contact with former DA Hynes over many years, he never heard former DA Hynes discuss the training of prosecutors in such areas.

138.    Even after judgments were entered against KCDA-affiliated individual capacity defendants in various civil rights lawsuits alleging prosecutorial and investigative misconduct, former DA Hynes's office conducted no investigation and imposed no discipline on any of the employees involved.

139.    Numerous cases handled by former DA Hynes's office evidence the above policies and practices of encouraging and tolerating misconduct by KCDA staff.

### The Rodney Russ Case

140.    Early in his tenure, former DA Hynes communicated to his employees his views about witness coercion and abusing court process by vigorously defending his Office's murder conviction obtained in *People v. Russ*, 79 N.Y.2d 173 (1992), a case where the KCDA secured a murder conviction by arresting and threatening a 17-year-old witness with prosecution and imprisonment until she agreed to testify against the defendant.  In reversing that conviction, the New York Court of Appeals condemned the "egregious" behavior of the KCDA in "'legally' coerc[ing] testimony."  *Id.* (citing *Rochin v. California*, 342 U.S. 165, 172 (1952) (conduct that "shocks the conscience").  The court wrote that such conduct prejudiced defendants, victimized witnesses, and undermined the integrity of the criminal justice process.

141.    No training or disciplinary action was taken to remedy the misconduct exposed in the *Russ* case.

### The Jabbar Collins Case

142.    Other examples of the KCDA's practice of improperly coercing false testimony and former DA Hynes's endorsement of that practice include the case of Jabbar Collins, where, as in Mr. DeBerry's case, the prosecution's key witnesses were secretly threatened.

143.    The lead prosecutor in Mr. Collins's criminal trial, Mr. Vecchione, falsely represented to the jury that his key witness, Edwin Oliva, had no incentive to testify for the

prosecution other than to tell the truth.  In fact, Mr. Oliva had been pressured to testify by KCDA detective investigators ("DIs") and Mr. Vecchione himself and offered leniency in his ongoing criminal matters.

144.    Mr. Vecchione suppressed a variety of *Brady* information, including a pre-trial recantation by Mr. Oliva, and the abuse of material witness orders to coerce testimony from two additional witnesses, Angel Santos and Adrian Diaz.

145.    Former DA Hynes vigorously defended the Collins conviction, including after the revelation of both the suppression of *Brady* information and the improper coercion of witnesses. Former DA Hynes also approved of the conduct of his prosecutors and investigators in those cases.

146.    Even after two federal judges characterized the conduct of the KCDA in the *Collins* case as "shameful" and a "disgrace," former DA Hynes defended Mr. Vecchione and took no action against him.  In fact, despite Mr. Vecchione consistently being admonished by courts for improper tactics, on November 28, 2007, DA Hynes issued a press release announcing that he would be personally presenting Mr. Vecchione with the Thomas E. Dewey Medal Award on behalf of the New York City Bar Association, "recognizing [his] excellent work" as "an outstanding prosecutor" in Kings County.  DA Hynes praised Mr. Vecchione as "an exceptional prosecutor" who was "truly deserving of this award," and boasted that Mr. Vecchione "exemplifies the qualities that serve as an example to all of our prosecutors."  Mr. Vecchione was subsequently promoted to run the KCDA's Sex Trafficking Unit.

147.    Discovery in Mr. Collins's § 1983 lawsuit yielded a host of evidence of the KCDA's unlawful policies, practices, and customs concerning the unlawful detention and coercion of prospective witnesses, including the testimony of former DA Hynes, Mr. Vecchione, former

Chief Assistant DA Amy Feinstein, KCDA Homicide Bureau Chief Kenneth Taub, Homicide Bureau paralegal Liz Noonan, and former Supervising DI Stephen Bondor.

## The Ruddy Quezada Case

148.    In the Ruddy Quezada case, the KCDA improperly coerced false testimony from Sisto Salcedo.  Mr. Salcedo was pressured into naming Mr. Quezada as the perpetrator of the crime, but before trial recanted and refused to testify.  Ephraim Shaban, the ADA on the case, submitted an *ex parte* application to the trial court for the issuance of a material witness order for Mr. Salcedo.  The purpose of the material witness order was to coerce Mr. Salcedo to revoke his recantation and testify as a prosecution witness.

149.    Mr. Shaban told the trial court that Mr. Salcedo had refused to meet with him and said he would not appear voluntarily.  Mr. Shaban then falsely swore that Mr. Salcedo had failed to comply with a subpoena seeking his attendance.  In fact, Mr. Shaban never had a subpoena served on Mr. Salcedo or even issued a subpoena for him.

150.    Contrary to the trial court's order, Mr. Salcedo was never brought before the court to be arraigned on the material witness warrant, appointed counsel, and provided the hearing required under Section 620.50 of the Criminal Procedure Law.  Instead, DIs held Mr. Salcedo extrajudicially.  The purpose of the threats and unlawful detention were to extort Mr. Salcedo to change his testimony to support the prosecution's case against Mr. Quezada.

151.    Despite the coercion, Mr. Salcedo told Mr. Shaban that he could not testify because he did not actually see who fired the shots.  Mr. Shaban replied that Mr. Salcedo had already given a statement identifying Mr. Quezada as the shooter and testified in the grand jury.  Mr. Shaban told Mr. Salcedo that if he went back on his prior statements, he would face prosecution for perjury or obstruction of justice.  At the time, Mr. Salcedo was serving a term of supervised release for a

federal drug conviction, had an open case being prosecuted by the KCDA (a fact that was never disclosed to the defense at trial), and was not a United States citizen.

152. Mr. Shaban repeatedly read to Mr. Salcedo the latter's prior recorded statement about the identification of Mr. Quezada. He told Mr. Salcedo that he would face dire consequences if he did not stick to that version. As a result of this pattern of coercion and threats, Mr. Salcedo agreed to repeat his previous accusation that he saw Mr. Quezada shoot the victim.

153. Mr. Salcedo took the stand at Mr. Quezada's criminal trial and testified as the detectives directed him to. After testifying, Mr. Salcedo was released from custody. In summation, both Mr. Shaban and defense counsel focused their arguments on the issue of witness credibility. Mr. Shaban emphasized to the jury that Salcedo "came forward" to testify. Mr. Shaban told the jury that Mr. Salcedo "was not hesitant," and, at one point in his summation, contended that "[o]nly one person"—Salcedo—"came forward to testify in this case." Mr. Shaban told the jury that once they decided that Mr. Salcedo was credible, they did not even need to consider the three alibi witnesses who testified for the defense.

154. Mr. Shaban hid the existence of the material witness order through years of post-conviction litigation in Mr. Quezada's case, which was only discovered through discovery ordered by the Eastern District of New York in a habeas proceeding.

155. Mr. Shaban was never disciplined as a result of the Ruddy Quezada case and is, in fact, now a Deputy Bureau Chief at the KCDA.

### The Bensale Neptune Case

156. In a July 7, 1994 decision, in another murder case being prosecuted by the Homicide Bureau under its then-Bureau Chief, former ADA Vecchione, Judge Abraham Gerges condemned a homicide ADA for serving a subpoena on a witness on a day there would be no testimony "in the hope that it would coerce the witness into consenting to be interviewed prior to

34

testifying." Judge Gerges denounced the "unprofessional conduct" under numerous prior court decisions outlawing the practice and admonished the KCDA that the "practice should not be replicated." *People v. Neptune*, 161 Misc. 2d 781, 785; 615 N.Y.S.2d 265, 267 (Sup. Ct. Kings Cty. July 7, 1994) (citations and quotations omitted).

## The Brian Bond Case

157.    Despite Judge Gerges's admonishment, those abusive practices continued.   In another murder case, *People v. Brian Bond*, Ind. No. 13991/91, the assigned ADA defied Judge Gerges and the decisions of the Court of Appeals and the Appellate Division upon which his decision had been based.  Former ADA Stan Irvin and DIs working under his direction illegally subpoenaed all prospective witnesses to their office to coerce them to submit to office interviews before testifying at trial.  Without disclosing to the court the impropriety of his subpoenas, Irvin then obtained material witness orders authorizing the arrest of any witness who failed to comply with the subpoenas.

158.    One witness, a drug addict named Carmen Green, had told police detectives and KCDA DIs that she had not seen the incident in question.  When DIs found her, they noted that she was too "impaired" to comply with the subpoena.  They knew as well that she was under investigation (and feared that she and her children would be arrested) for dealing drugs out of her apartment.  Former ADA Irvin obtained a material witness warrant authorizing Ms. Green to be taken "forthwith" to court.  Then, without waiting for an attorney to be appointed for Ms. Green, former ADA Irvin had her brought to his office, where he and the detectives threatened her with incarceration and interrogated her on and off for eight hours.  Only after the witness submitted to their custody did the ADA and DIs finally bring her to court, after midnight, so that a judge could sign an order ratifying what was misrepresented as her "consent" to be detained until the conclusion of her testimony.

159.     After this litany of unlawful behavior, former ADA Irvin continued to violate *Brady* by not disclosing to the defense Ms. Green's prior statements denying having seen the shooting, her eight-hour unlawful interrogation, her evident drug impairment, the threats made to arrest her and her family, and promises to relocate her at public expense. Nor did he disclose the statements of her other family members that she was not present during the shooting, or that they, too, had been promised, and did receive, relocation assistance. Based on Ms. Green's testimony, Mr. Bond was convicted of murder.

160.     During an evidentiary hearing held in 1998 concerning Mr. Bond's subsequent motion to vacate his conviction due to *Brady* and related constitutional violations, an unapologetic then-ADA Irvin testified that it was the Office's regular practice to pick up witnesses on material witness warrants and, instead of bringing them directly to court "forthwith" as such warrants direct, to forcibly take them for interrogation to the KCDA.

161.     In 2000, the New York Court of Appeals vacated Mr. Bond's conviction due to the Office's failure to disclose Ms. Green's statements denying having seen the homicide. The KCDA Appeals Bureau had argued, on behalf of then-DA Hynes, that it had no obligation to disclose statements that, in its view, were "untrue."

**The Zaher Zahrey Case**

162.     In August and September 1994, during the KCDA's investigation of an NYPD detective, Zaher Zahrey, on corruption allegations, detectives working under the supervision of KCDA prosecutors obtained court orders to produce a prospective witness, Sidney Quick, who was a crack addict and a career criminal, for interviews on the condition that his attorney would be present, but then, with the prosecutor's approval, interrogated him without notifying his attorney.

163.    In March 1995, after Mr. Quick had been sent upstate to serve his sentence, detectives, with the prosecutor's approval, again met with Mr. Quick without his attorney, and, through a combination of coercion and promises of expedited release, caused him to adopt a story they suggested to him, implicating the target of their investigation, which they knew from other evidence was false.  They tape recorded this meeting and gave the tape to the prosecutor, who listened to it, heard the coercion and improper promises, and heard the encouragement of Mr. Quick to adopt a false story.  Rather than condemn the detectives' tactics, however, the prosecutor told them that Mr. Quick's statements were "promising."

164.    In or about January 1996, detectives working directly under KCDA prosecutors' supervision arrested several other individuals in the hope of turning them into prosecution witnesses, took them to remote locations instead of to court, and illegally interrogated them in violation of their rights to counsel and prompt arraignment.

165.    Because none of Mr. Quick's false story could be corroborated, which is a prerequisite for prosecution under New York law, KCDA prosecutors obtained former DA Hynes's approval to recommend the case to federal authorities for prosecution.  In doing so, however, former DA Hynes's prosecutors did not disclose to the federal authorities the tape, the improper interrogation tactics used with Mr. Quick, or numerous of Mr. Quick's prior inconsistent statements.  When Mr. Quick inadvertently disclosed to the federal prosecutor that he had been taped, KCDA employees delayed disclosing the tape for several weeks to ensure that the federal authorities went ahead with the high-profile indictment and publicly committed themselves to the case.  Mr. Zahrey ultimately was acquitted, but not until he had spent nearly nine months in pretrial confinement.

## The Sarni Leka Case

166.     Former DA Hynes likewise ratified his employees' misconduct in the 1990 Sarni Leka prosecution.  Shortly after his 1990 conviction, Mr. Leka moved to vacate his conviction because the prosecution intentionally suppressed a variety of *Brady* information.  Not only did the KCDA vigorously oppose Mr. Leka's motion and appeal, but former DA Hynes wrote that he had "personally reviewed the facts and circumstances" of the case and "Mr. Leka's due process right as a defendant were amply and ably protected."  Years later, however, the U.S. Court of Appeals for the Second Circuit vacated Mr. Leka's conviction, finding that the KCDA had actively "suppressed" exculpatory evidence, decrying one of its arguments as "ridiculous," and concluding that the evidence the prosecution had suppressed would have had a "seismic impact" upon the results of the trial.  *Leka v. Portuondo*, 257 F.3d 89 (2d Cir. 2001).  With the only two identification witnesses having recanted their testimony, the KCDA was forced to dismiss the case and Leka, an apparently innocent man, was released after serving 12 years in prison.

167.     No training or disciplinary action was taken to remedy the misconduct exposed in the *Leka* case.

## Case Studies in Improper Police Conduct

168.     The Mollen Report and NYSBA Report revealed a laissez-faire NYPD regime and a stunning pattern of falsification.  These findings are illustrated by the voluminous record of Brooklyn cases demonstrating that Brooklyn detectives, like Defendant Tufo, felt free to go rogue. This pattern of behavior supports a clear inference that unscrupulous tactics were considered normal, acceptable, and encouraged among Brooklyn detectives, as demonstrated in the following cases:

> a.  David McCallum and Willie Stuckey – In October 1985, Brooklyn Detective Joseph Butta allegedly coerced false confessions from David McCallum and Willie Stuckey through the use of physical intimidation (slapping McCallum in

the mouth and drawing blood, and hitting Stuckey three or four times with an open hand), threats of physical intimidation (with McCallum, picking up a chair and threatening to hit him across the head with it) and promises of leniency, e.g., telling Stuckey that he could go home if he only cooperated ("Q. And what did he tell you would happen to you if you said those things? A. He told me he was going to call my house and he's going to let me go"; "Q. And right after you made the tape, did you think you were going home? A. Yes."). Both men recanted immediately and, tellingly, both confessions contained inconsistencies, false fed facts and fabrications. The defendants' motions to vacate the convictions were granted on October 15, 2014, absent objection from the KCDA.

b. Antonio Yarbough and Sharrif Wilson — On June 18, 1992, 18-year-old Antonio Yarbough came home to find that his mother, 12-year-old sister and young family friend, also 12 years old, had been savagely murdered, tied up, stabbed and garroted with electrical cords. Yarbough, who reported the crime to the police, and a 15-year-old friend, Sharrif Wilson, confessed to the murders later that same day. Both men were convicted (in Yarbough's case after a second trial, the first ending in a mistrial) and served nearly 22 years in jail before DNA evidence ruled them out as perpetrators. In 2014, a Kings County Supreme Court Justice granted their motion to vacate, absent objection from the District Attorney. According to a federal civil rights complaint filed by Yarbough, the NYPD allegedly used a combination of physical and psychological coercive techniques to secure the confessions, the latter including sleep deprivation, false evidence ploys and false promises of leniency (including allegedly telling Wilson that they would let him go home if he would only tell them what they wanted to hear).

c. Colin Warner — Convicted in 1982 for the 1980 shooting death of Mario Hamilton; the victim's brother, Martell Hamilton, asserted that a member of the NYPD pressured him into picking out a photograph of Warner as someone he may have seen near the scene of the crime. Warner's motion for exoneration was granted in 2001, absent objection from the KCDA.

d. Barry Gibbs — Convicted in 1988 for the murder of Virginia Robertson. Gibbs was exonerated in 2005 after the sole eye witness, David Mitchell, recanted his line-up and trial identification of Gibbs. Mitchell asserted that NYPD Detective Louis Ippolito had threatened his family if he did not identify Gibbs.

e. Derrick Deacon — Convicted in 1989 for the murder that same year of Anthony Wynn. Colleen Campbell was a witness who saw the shooter in the hallway of the apartment building where the shooting took place, and who gave a physical description of him to the NYPD. When the NYPD identified Deacon as a suspect, she told them it was definitely not Deacon, a man she knew from the neighborhood. Although she was called as a defense witness at trial to testify to that effect, she wavered on the stand and said she could not be sure. Years later, she testified in exoneration proceedings that the NYPD pressured her prior

to her testimony, threatening her with the loss of her children if she did not cooperate with them. Although Deacon lost his motion to vacate at the Supreme Court level, the Appellate Division reversed, the case was re-tried in 2013 and he was acquitted.

f.  Jonathan Fleming — Convicted in 1990 for the shooting murder of Darryl Rush in 1989. Jacqueline Belardo was a key witness at Fleming's trial—she testified to having witnessed the shooting and said she recognized Fleming as the shooter. That testimony was false. Belardo only heard shots and did not see any shooter. She recanted her testimony and asserted that she agreed to identify Fleming at trial only after police officers threatened her with jail time on an unrelated felony larceny charge. Her assertion was corroborated by evidence of that larceny arrest and the charge's subsequent dismissal. Fleming's motion for exoneration was granted in 2014 absent objection from the KCDA.

g.  Carlos Davis — Acquitted in 1991 of the 1988 murder of Norris Williams but convicted of criminal possession of a weapon; it was later determined that the sole alleged eyewitness to the murder, supposedly Christina Smith, gave a false name. Her actual name was Kristie Hayes. The KCDA joined in Davis' motion to vacate his conviction in April 2015, after the CRU interviewed Hayes and determined that she lacked credibility. Davis' pending federal civil rights complaint alleges that, desperate to save their criminal case after other alleged eyewitnesses recanted or refused to testify, Kings County ADAs and a sergeant in the NYPD located Smith/Hayes and fed her a false narrative for use at trial.

169.    Criminal and civil cases demonstrating the unconstitutional patterns, policies, customs, and usages of the NYPD may be further inferred from numerous cases in which the NYPD violated its *Brady* obligations, and the NYPD turned a blind eye to officer dishonesty, as demonstrated in the following cases:

a.  *People v. Cortez*, 149 Misc.2d 886 (Sup. Ct. Kings Co. 1990) (police violated "spirit" of *Brady* by intentionally destroying a tape they were ordered by the court to preserve and finding that the DA's Office shared responsibility and the indictment was dismissed);

b.  *People v. Moss*, 176 A.D.2d 826 (2d Dept. 1991) (conviction reversed for police officer's loss and/or destruction of contemporaneous description of the defendant);

c.  *People v. Clausell*, 182 A.D.2d 132 (2d Dept. 1992) (police failed to disclose buy report with description of suspect that was inconsistent with officer's testimony and new trial ordered for *Brady* violation);

d. *People v. Nikollaj*, 155 Misc.2d 642 (Sup. Ct. Bronx County 1992) (new trial ordered for *Rosario* violations where police failed to turn over numerous inconsistent statements of complainant officers);

e. *People v. Dunn*, 185 A.D.2d 54 (1st Dept. 1993) (conviction reversed in part where, among other things, police detective destroyed interview notes);

f. *People v. Morrow*, 204 A.D.2d 356 (2d Dept. 1994) (conviction reversed where a significant portion of police report was not disclosed);

g. *People v. White*, 200 A.D.2d 351 (Pt Dept. 1994) (conviction reversed where DD-5 containing *Brady* and *Rosario* material was not disclosed, and only was discovered through defendant's post-conviction FOIL request to the NYPD and Bronx DA's Office);

h. *People v. Anderson*, 222 A.D.2d 442 (2d Dept. 1995) (conviction reversed where scratch notes lost or destroyed due to officer's "lack of due care");

## DAMAGES

170.    This action seeks damages for the period from August 3, 1999 (the date of Mr. DeBerry's arrest) through the present.  Defendants' unlawful, intentional, willful, purposeful, deliberately indifferent, reckless, bad-faith and/or malicious acts, misdeeds, and omissions caused Mr. DeBerry to be maliciously prosecuted, unfairly tried, wrongfully convicted, and to endure more than 20 years of wrongful imprisonment, including the physical and mental damage arising therefrom.

171.    Mr. DeBerry went to prison in his 20s and left as a 44-year-old man.  He spent his entire young adulthood imprisoned for a crime he did not commit.  During his wrongful imprisonment, Mr. DeBerry suffered extreme hardships, including, without limitation, physical assault, psychological abuse, extreme degradation, pain and suffering, and the loss of 20 years of his life.

172.    Mr. DeBerry also lost tremendous opportunities.  He lost a career as a commercial painter, precious time with his family and friends, and the most vital years of his life.  He lost both

his parents, who died during his incarceration. He was also deprived of the opportunity to develop a relationship with his daughter, who was only a few months old when he was arrested.

173. As a direct and proximate result of the acts of Defendants, the injuries and damages sustained by Mr. DeBerry, arising from the deprivation of his civil rights, include: the violations of his clearly established rights under the Fourth, Fifth, and Fourteenth Amendments to the U.S. Constitution; personal injuries; past and future pain and suffering; past and future severe mental anguish; past and future emotional distress; extreme fear; economic damages including loss of income and diminution in future earning potential and the inability to obtain certain professional licenses; infliction of physical illness and injury resulting from his confinement; humiliation, indignities, embarrassment, degradation, egregious injury to reputation; permanent loss of natural psychological development; and restrictions on all forms of personal freedom and physical liberty including but not limited to diet, sleep, personal care, personal contact, educational opportunity, vocational opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression.

174. All the alleged acts, misdeeds and omissions committed by the individual Defendants described herein for which liability is claimed were done intentionally, willfully, purposefully, knowingly, unlawfully, maliciously, wantonly, recklessly, and/or with bad faith, and said proscribed conduct of the individual Defendants meets all of the standards for imposition of punitive damages.

175. Between 1995 and 2020, numerous Comptrollers for the City of New York commissioned studies and wrote memoranda to document the City of New York's persistent failure to follow up on lawsuits alleging civil rights violations by referring cases involving evidence of misconduct for employee discipline, training, or other corrective action.

176.     The practice of turning a blind eye to documented cases of police and prosecutorial misconduct and failing to implement discipline and training in response to misconduct proximately caused the violations of Mr. DeBerry's rights as set forth in this Complaint.

## FIRST CAUSE OF ACTION

### 42. U.S.C. § 1983

*Denial of Due Process and Right to a Fair Trial,*
*Fabrication of Evidence, and Suppression of* Brady *Information*
*(U.S. Constitution Amendments VI, V, and XIV)*

**Against Individual Defendants Tufo, Barcus, and John and Jane Does 1-25**

177.     Mr. DeBerry repeats and realleges each and every allegation contained in the proceeding paragraphs above as if fully set forth herein.

178.     Individual Defendants, acting deliberately, with malice and under color of law, deprived Mr. DeBerry of his clearly established rights under the Fourth and Fourteenth Amendments to the U.S. Constitution to be free from unreasonable seizure.  They did so by knowingly and intentionally manufacturing, caused the manufacturing of, or failing to intervene in the manufacturing of false or misleading evidence by coercing Mr. Collins to give inculpatory testimony against Mr. DeBerry.

179.     No person of reasonable caution and acting in good faith, having the knowledge and information Individual Defendants had, would have been warranted in concluding that Mr. DeBerry was involved in the shooting of Mr. Collins, such as to support a probable cause determination.  Even setting aside their knowledge that Defendant Tufo had coerced Mr. Collins to identify Mr. DeBerry, Individual Defendants knew or, in the absence of deliberate indifference, recklessness, and gross negligence, should have known that there were numerous reasons for skepticism about the truth of the identification.  These include, but are not limited to, (i) Defendant Tufo's dependence on an anonymous, hearsay report allegedly identifying the perpetrator; (ii) the

discrepancies between Mr. DeBerry's physical characteristics and the physical description that Defendant Tufo received of the perpetrator; (iii) inconsistencies in Mr. Collins's accounts of the incident; (iv) reports by witnesses that two guns were fired on July 11, 1999, that the shots were fired in a shootout and not a shooting, and that 12 shots (triple the number of gunshot wounds Mr. Collins suffered) had been fired; (v) Mr. Collins's inability to identify his shooter during Defendant Tufo's visit to him at the hospital the day after the shooting; (vi) Mr. Collins's inability to recognize his shooter among the photographs in the array that Defendant Tufo showed him on July 23, 1999; (vii) the complete absence of physical and forensic evidence tying Mr. DeBerry to the murder; and (viii) the lack of any motive attributable to Mr. DeBerry.

180.    The presumption of probable cause created by the grand jury indictment is overcome by the fact that Mr. DeBerry's indictment was secured based on perjury and other bad faith police misconduct.  Specifically, the identification of Mr. DeBerry adopted by Mr. Collins was, upon information and belief, the central piece of evidence presented to the grand jury and proximately caused the resulting indictment.

181.    Individual Defendants knew, intended, or were deliberately indifferent to the fact that the false and misleading evidence would deprive Mr. DeBerry of a fair trial and result in his wrongful conviction and incarceration.

182.    Individual Defendants knew, intended, or were deliberately indifferent to the fact that *Brady* information—including Defendant Tufo's coercion of Mr. Collins and conferral of benefits to him—would be concealed from Mr. DeBerry and his attorney.

183.    Individual Defendants' conduct deprived Mr. DeBerry of his rights under the Constitution: (a) not to be prosecuted, convicted, or imprisoned based on false, fabricated, manufactured, or misleading evidence, including the testimony of Mr. Collins who was improperly

influenced, coerced, and manipulated to give false testimony, and whose testimony Individual Defendants knew was false, in violation of the Due Process and Fair Trial Clauses of the Fifth and Fourteenth Amendments to the U.S. Constitution; and (b) to timely disclosure of material evidence favorable to the defense under *Brady* in violation of his rights under the Fifth and Fourteenth Amendments to the U.S. Constitution.

184.    Individual Defendants' acts and omissions proximately caused the continuation of Mr. DeBerry's criminal prosecution, his conviction, his loss of liberty and detention, and his resulting damages.

185.    Individual Defendants committed the foregoing violations knowingly, intentionally, willfully, recklessly, and with deliberate indifference to Mr. DeBerry's constitutional rights.

186.    Defendant Tufo's falsification of evidence, coercion of Mr. Collins, and arrest of Mr. DeBerry without probable cause establishes that she acted with actual malice.

187.    Defendant Barcus's knowledge of such falsification of evidence, coercion of Mr. Collins, and arrest of DeBerry without probable cause establishes that he acted with actual malice.

188.    Defendants John and Jane Does 1-25 are officers and/or supervisors of the NYPD who knew of and aided and abetted, and/or failed to intervene to prevent, Detective Tufo's coercion of false testimony against Mr. DeBerry, arrest of Mr. DeBerry without probable cause, and denial of Mr. DeBerry's right to a fair trial.

189.    The prosecution terminated in Mr. DeBerry's favor when his conviction was eventually vacated.

190.    Mr. DeBerry was, in fact, innocent of the crimes for which he was convicted and incarcerated.

191.    Individual Defendants' actions were willful, malicious, oppressive, and reckless, and were of such a nature that punitive damages should be imposed.

## SECOND CAUSE OF ACTION

### 42. U.S.C. § 1983

*Monell v. Department of Social Services*, 436 U.S. 658 (1978)

### Against Defendant the City of New York

192.    Mr. DeBerry repeats and realleges the foregoing paragraphs and incorporates them by reference as if fully set forth herein.

193.    At the time of Mr. DeBerry's prosecution, continuing through the time his conviction was vacated, the NYPD, in conjunction with the KCDA, both agencies of Defendant the City of New York, created and/or maintained policies, customs, and/or practices of deliberate indifference to violations of the constitutional rights of individuals who were investigated and criminally prosecuted in Brooklyn, including through (i) manufacturing false and/or misleading evidence and testimony through improper coercion of witnesses; (ii) knowingly presenting false testimony and arguments at criminal proceedings; (iii) suppressing *Brady* information; (iv) unlawfully arresting, imprisoning, and coercing witnesses; (v) abusing court processes; and (vi) covering up these unlawful practices.

194.    Just several years before Mr. DeBerry's trial, the Mollen Commission investigated a time period covering the same years that Mr. DeBerry was unlawfully arrested and falsely convicted.  The Mollen Report exposed the NYPD's practice of failing to properly train, supervise, and discipline officers for fabricating evidence, engaging in improper police investigations, and failing to turn over *Brady* material.

195.    This Court has previously found that the Mollen Report provides sufficient evidence to establish that there was an unlawful custom or practice within the NYPD during the

time period in question. *See e.g.*, *Pipitone*, 57 F. Supp. at 191. Indeed, the investigation of Mr. Collins's shooting, and the resulting conviction of Mr. DeBerry, falls within a judicially recognized window wherein Defendant Tufo "engaged in false and misleading practices." *People v. Hargrave*, 16 N.Y.S.3d 793 (Sup. Ct. 2015).

196.    As the Mollen Report found, Defendant Tufo's misconduct could not have been isolated or unknown within the NYPD. Rather, a laissez-faire NYPD culture, paired with a statistic-obsessed KCDA, allowed Defendant Tufo to continuously violate the constitutional rights of the citizens of New York City, including Mr. DeBerry. In Mr. DeBerry's case, Defendant Tufo manufactured an identification to secure Mr. DeBerry's unlawful arrest, conviction, and imprisonment.

197.    The size and magnitude of Defendant Tufo's misconduct could not have gone unnoticed. Yet Defendant Tufo suffered no consequences.

198.    The prosecutor's conduct in this case also exemplifies the KCDA's culture during this time period that valued winning over the truth or defendants' constitutional rights. Former DA Hynes has admitted in litigation that he and high-level KCDA management failed to discipline prosecutors who were found by appeals courts to have acted improperly by withholding *Brady* material and engaging in other misconduct. This created a *de facto* policy of immunity from disciplinary action that fostered prosecutorial misconduct so long as it secured convictions. Such prosecutorial misconduct included, *inter alia*, suppressing *Brady* information and misleading witnesses, as in the instant case.

199.    The ADAs prosecuting Mr. DeBerry knew that DA Hynes would not only fail to discipline them, but that he would support them and oppose any attempts to uncover the wrongdoing of wrongful convictions.

200.    The violations of Mr. DeBerry's constitutional rights and his resulting injuries were proximately and foreseeably caused by conduct, chargeable to the NYPD, the KCDA, former DA Hynes, and by extension, the City of New York, amounting to deliberate indifference to the constitutional rights of persons, including Mr. DeBerry, subject to investigation and prosecution by the KCDA, including:

    a.   The institution and implementation of inadequate and unlawful policies, procedures, and customs concerning:

        i.    the duty not to create or use false or misleading evidence, testimony, and arguments during criminal proceedings, including bail hearings, pretrial hearings, trials, and post-conviction proceedings;

        ii.   the continuing obligation to correct false, inaccurate, incomplete or misleading evidence, testimony, statements, and argument, whenever such misconduct is discovered to have occurred, including moving or consenting to overturn convictions discovered to have been obtained through such unconstitutional means; and

        iii.  the continuing duty to obtain, preserve, and timely disclose, during criminal investigations and prosecutions, all material evidence or information favorable to a person suspected, accused, or convicted of criminal conduct, including exculpatory evidence as well as evidence impeaching or undermining prosecution witnesses; and

    b.   the failure to adequately instruct, train, supervise, and discipline employees with respect to such matters.

201.    The foregoing express or *de facto* policies, practices, and customs (including the failure to properly instruct, train, supervise, or discipline employees with regard thereto) were implemented or tolerated by policymaking officials for Defendant the City of New York, who knew that such policies, procedures, regulations, practices, and customs implicated issues that regularly arise in the investigation and prosecution of criminal cases.

202.    Former DA Hynes and his delegates knew of the unconstitutional conduct occurring among KCDA prosecutors and investigators in light of the numerous credible allegations, many substantiated by judicial decisions, that prosecutors and investigators (i) wrongfully withheld, lost,

or destroyed evidence favorable to the defense that the prosecution was required to timely disclose to the defense under *Brady*; (ii) had presented or failed to correct false or misleading testimony and argument; and (iii) had abused judicial process to coerce false or inherently unreliable statements or testimony from witnesses.

203.     Further evidence of the unconstitutional conduct occurring and the need for proper training, supervision, and disciplinary practices includes numerous decisions of the United States Supreme Court, the United States Court of Appeals for the Second Circuit, the New York Court of Appeals, and the New York Appellate Division, discussing the difficult issues that regularly arise under the *Brady* rule and the failures of NYPD and Brooklyn prosecutors to comply with that rule; and judicial decisions putting the City on notice it could be held liable for its failure to adequately train, supervise, or discipline prosecutors regarding their *Brady* and related due process obligations, including their obligations not to abuse judicial process, coerce witnesses, or use false testimony or argument. *See, e.g.*, *Walker v. City of New York*, 974 F.2d 293 (2d Cir. 1992); *Zahrey v. City of New York*, No. 98 Civ. 4546 (DCP), 2009 WL 54495 (S.D.N.Y. Jan. 27, 2009); *Leka v. City of New York*, No. 04 CV 8784 (DAB), 2006 WL 281621 (S.D.N.Y. Sept. 29, 2006); *Ramos v. City of New York*, 285 A.D.2d 284, 729 N.Y.S.2d 678, 692-96 (1st Dep't. 2001).

204.     Despite this knowledge, the supervisory and policymaking officers and officials of Defendant the City of New York, including the NYPD and KCDA, perpetuated, or failed to take preventative or remedial measures to terminate, said policies, procedures, practices, and customs; did not effectively instruct, train, or supervise their personnel with regard to the proper constitutional and statutory requirements in the exercise of their authority; had no employee handbook or other published practices, policies, or procedures for investigating and disciplining prosecutors who had engaged in *Brady* violations and related constitutional violations, and did not

discipline or otherwise properly supervise the individual personnel who engaged in such practices, but instead tolerated the policies, procedures, regulations, practices, and customs, described above, with deliberate indifference to the effect their actions would have upon the constitutional rights of individuals and citizens of the City and State of New York.

205.    The aforesaid policies, practices, and customs of the City of New York were collectively and individually a substantial factor in bringing about the aforesaid violations of Mr. DeBerry's rights under the Constitution and laws of the United States, and in causing his wrongful conviction and resulting damages.

206.    NYPD officers, KCDA prosecutors, and the supervisors and policymakers in those offices were deliberately indifferent to the manner in which convictions were secured without regard to defendants' constitutional rights or guilt.   The violations of defendants' rights were endemic, and the City of New York was aware of these practices but did not take corrective or preventative action to correct it.

### THIRD CAUSE OF ACTION

**Malicious Prosecution**

*New York State Law*

**Against All Defendants**

207.    Mr. DeBerry repeats and realleges the foregoing paragraphs and incorporates them by reference as if fully set forth herein.

208.    Individual Defendants continued and caused the continuation of criminal proceedings against Mr. DeBerry at a time when there was no probable cause for continuation of the criminal proceedings.

209. Defendant Tufo, who coerced Mr. Collins into falsely identifying and falsely testifying against Mr. DeBerry, knew that there was no probable cause for Mr. DeBerry's continued prosecution.

210. The criminal proceedings terminated in Mr. DeBerry's favor.

211. Individual Defendants acted for improper purposes and with actual malice.

212. Defendant the City of New York is liable under the doctrine of *respondeat superior*.

213. By virtue of the foregoing, Individual Defendants and the City of New York are liable for having substantially caused the foregoing violations of Mr. DeBerry's constitutional rights and his resulting injuries.

## FOURTH CAUSE OF ACTION

### Intentional Infliction of Emotional Distress

*New York State Law*

### Against All Defendants

214. Mr. DeBerry repeats and realleges the foregoing paragraphs and incorporates them by reference as if fully set forth herein.

215. Individual Defendants engaged in a continuing pattern of extreme and outrageous conduct directed at Mr. DeBerry from at least August 3, 1999, through the vacatur of Mr. DeBerry's conviction on June 16, 2020 and his release from custody on June 23, 2020.

216. Individual Defendants engaged in that pattern of conduct with the intent of causing, or with reckless disregard for the substantial probability that it would cause, severe emotional distress to Mr. DeBerry.

217. Individual Defendants' actions proximately caused severe emotional distress to Mr. DeBerry.

218. Defendant the City of New York is liable under the doctrine of *respondeat superior*.

219. By virtue of the foregoing, Individual Defendants and the City of New York are liable for having substantially caused the foregoing violations of Mr. DeBerry's constitutional rights and his resulting injuries.

## FIFTH CAUSE OF ACTION

### Negligent Training, Supervision, and Discipline

*New York State Law*

### Against Defendant the City of New York

220. Mr. DeBerry repeats and realleges the foregoing paragraphs and incorporates them by reference as if fully set forth herein.

221. Defendant the City of New York, intentionally, recklessly, negligently, and/or with deliberate indifference failed to adequately train, supervise, and discipline agents and employees of the NYPD and KCDA with regard to the matters described above.

222. Defendant the City of New York's inadequate training, supervision, and discipline proximately caused the misconduct described above and Mr. DeBerry's wrongful conviction and resulting damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Eric DeBerry demands judgment against the above-captioned Defendants as follows:

a. For compensatory damages to be determined at trial;

b. For punitive damages against the individual Defendants in an amount to be determined at trial;

c. For reasonable attorneys' fees, costs, and disbursements, under 42 U.S.C. § 1988 and other applicable laws;

d. For pre- and post-judgment interest as allowed by law; and

e. For such other relief as this Court deems just and proper.

Dated: September 14, 2021
New York, New York

WHITE & CASE LLP

Samuel P. Hershey
David Hille
Gina Chiappetta
Sally Kagay
1221 Avenue of Americas
New York, New York 10011
(212) 819-8200

DAVID B. SHANIES LAW OFFICE LLC

David B. Shanies
Deborah I. Francois
Morgan A. Miller
411 Lafayette Street, Sixth Floor
New York, New York 10003
(212) 951-1710

*Attorneys for Plaintiff Eric DeBerry*